UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS CORPORATION,

       *Plaintiff,*

vs.

LANARD TOYS, INC., and
LANARD TOYS LIMITED,

       *Defendants.*

RECEIVED
JUN 1 1 2003
CLERK'S OFFICE
DETROIT

HONORABLE ARTHUR TARNOW

CIVIL ACTION NO. 01-71103

*JURY TRIAL DEMANDED*

---

MARK A. CANTOR    (P32661)
MARC LORELLI    (P63156)
**BROOKS & KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075
Tel:    (248) 358-4400
Fax:    (248) 358-3351

    *Attorneys for Plaintiff*

CHARLES E. ELLERBROCK    (P43795)
**GENERAL MOTORS CORPORATION**
LEGAL STAFF
300 Renaissance Center
Detroit, Michigan 48265-3000
Tel:    (313) 665-4709
Fax:    (313) 665-4976

    *Of Counsel for Plaintiff*

STEPHEN WASINGER    (P25963)
GREGORY D. HANLEY    (P51204)
TAMMIE J. TISCHLER    (P59516)
**WASINGER KICKHAM AND HANLEY**
100 Beacon Centre
26862 Woodward Avenue
Royal Oak, Michigan 48067-0958
Tel:    (248) 414-9900
Fax:    (248) 414-9906

    *Attorneys for Defendants*

RICHARD P. SYBERT
**GORDON & REES LLP**
101 West Broadway, Suite 1600
San Diego, California 92101
Tel:    (619) 696-6700
Fax:    (619) 696-7124

    *Of Counsel for Defendants*

---



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

# BRIEF IN SUPPORT OF GENERAL MOTORS' MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF THE HUMMER NOSE DESIGN TRADEMARK AND THE HUMMER VEHICLE TRADE DRESS

134

## TABLE OF CONTENTS

Page

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.   The Hummer Vehicle Design . . . . . . . . . . . . . . . . . . . . . . . . 3

           a.   AM General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           b.   General Motors . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      2.   AM General And General Motors' Use Of The
           Hummer Vehicle Design For Toys . . . . . . . . . . . . . . . . . . . . . 8

      3.   Lanard's Use Of General Motors' Hummer
           Vehicle Design In Its Toys . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           a.   The CORPS! ATK Vehicle . . . . . . . . . . . . . . . . . . . 10

           b.   Mean Machine Vehicle . . . . . . . . . . . . . . . . . . . . . . 10

           c.   Super Shots Pull String Vehicle . . . . . . . . . . . . . . . . 11

           d.   Ultra CORPS! ATK Vehicle . . . . . . . . . . . . . . . . . . . 12

           e.   Infrared Vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.   The Law Of Summary Judgment . . . . . . . . . . . . . . . . . . . . . 14

      2.   Federal Trademark Infringement . . . . . . . . . . . . . . . . . . . . . 15

      3.   The Law Of Trade Dress Infringement . . . . . . . . . . . . . . . . . 15

      B.   The Hummer Vehicle Design Is Protectable Trade Dress . . . . . . . . . . . 17



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-i-

        1.     GM's Hummer Vehicle Trade Dress Has Acquired
Secondary Meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.     GM's Hummer Vehicle Trade Dress Is Non-Functional . . . . . . . 19

   C.    Lanard's Copying The Hummer Vehicle Design Creates
A Presumption Of Likelihood Of Confusion For Both The
Hummer Vehicle Trade Dress And The Hummer
Nose Design Trademark . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   D.    GM's Survey Evidence Establishes That The Public
Is Being Confused As To Whether The Accused
Toys Are Sponsored Or Approved By GM . . . . . . . . . . . . . . . . . 20

   E.    A Finding Of Likelihood Of Confusion Is Also
Required When Considering All Relevant Factors
Under The Federal Lanham Act And Michigan Law . . . . . . . . . . . . 22

        1.     Strength of the Mark . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.     Relatedness of the Goods . . . . . . . . . . . . . . . . . . . . . . . . 25

        3.     Similarity Of Marks . . . . . . . . . . . . . . . . . . . . . . . . . . 26

             a.     Hummer Nose Design Trademark . . . . . . . . . . . . . . . 26

             b.     Hummer Vehicle Trade Dress . . . . . . . . . . . . . . . . . 27

        4.     Evidence Of Actual Confusion . . . . . . . . . . . . . . . . . . . . . 29

        5.     Marketing Channels Used . . . . . . . . . . . . . . . . . . . . . . . 29

        6.     Likely Degree Of Purchaser Care . . . . . . . . . . . . . . . . . . . 30

        7.     Intent in Incorporating the Hummer Nose Design Trademark . . . 30

        8.     Likelihood Of Expansion Of The Product Line . . . . . . . . . . . . 31

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## TABLE OF AUTHORITIES

### CASES

*AM General Corp. and General Motors Corp. v. DaimlerChrysler Corp.*,
   311 F.3d 796 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 7, 8, 22, 23, 24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Boyd v. Ford Motor Co.*,
   948 F.2d 283 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brust Environment & Infrastructure, Inc. v. Teunissen*,
   131 F.3d 1210 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Carson v. Here's Johnny Portable Toilets, Inc.*,
   698 F.2d 831 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chrysler Corp. v. Newfield*,
   880 F. Supp. 504 (E.D. Mich 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 31

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*,
   109 F.3d 275 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*DAP Products v. Color Tile Manufacturing*,
   821 F.Supp. 488 (S.D. Ohio 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Elvis Presley Enterprises v. Elvisly Yours, Inc.*,
   936 F.2d 889 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ferrari S.P.A. Esercizio Fabriche Automobili e Corse v. Roberts*,
   944 F.2d 1235 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 19, 20, 22

*Frisch's Restaurants v. Elby's Big Boy, Inc.*,
   670 F.2d 642 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 31



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-iii-

*Gray v. Meijer, Inc.*,
    295 F.3d 641 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Henri's Food Products Co., Inc. v. Kraft, Inc.*,
    717 F.2d 352 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

*Homeowners Group v. Home Marketing Specialists*,
    931 F.2d 1100 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Marketing Displays, Inc. v. Traffix Devices, Inc.*,
    200 F.3d 929 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McLean v. Fleming*,
    96 U.S. 245 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Pita Delight v. Salami*,
    24 F. Supp. 795 (E.D. Mich. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*,
    748 F.2d 669 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Stewart Hall Co., Inc. v. Ampad Corp.*,
    51 F.3d 780 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wood Smith Pub Co. v. Meredith Corp.*,
    904 F.2d 1244 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wynn Oil Co. v. American Way Serv. Corp.*,
    943 F.2d 595 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28, 30

*Wynn Oil Co. v. Thomas*,
    839 F.2d 1183 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## STATUTES

15 U.S.C. § 1114(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15 U.S.C. § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 1501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**BK**

LAW OFFICES

**BROOKS & KUSHMAN P.C.**

1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## ISSUES PRESENTED

- Is GM entitled to summary judgment that Lanard's accused toys infringe U.S. Registration No. 1,959,544 ("the '544 registration") for the Hummer Nose Design Trademark?

   In order to prove the aforementioned issue, GM must prove that there is no genuine issue of fact as to the following issue:

   1. Has GM established that Lanard's toys create a likelihood of confusion regarding their source, affiliation, sponsorship, or approval?

      GM Answers *"Yes"*

- Is GM entitled to summary judgment that Lanard's accused toys infringe GM's Hummer vehicle trade dress?

   In order to prove the aforementioned issue, GM must prove that there is no genuine issue of fact as to the following three sub-issues:

   1. Has GM established that the Hummer vehicle trade dress has acquired secondary meaning?

   2. Has GM established that the Hummer vehicle trade dress is primarily non-functional?

   3. Has GM established that there is a likelihood of confusion between Lanard's toys and the Hummer vehicle trade dress?

      GM Answers *"Yes"* to all



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-vi-

# I.  INTRODUCTION

This is a trademark, trade dress infringement and unfair competition case in which plaintiff, General Motors Corporation ("GM"), has alleged that defendants, Lanard Toys Limited and Lanard Toys, Inc. ("Lanard"), have unlawfully copied GM's longstanding, universally recognized Hummer vehicle design into its toy products. Specifically, Lanard's toy products infringe U.S. Registration No. 1,959,544 ("the '544 registration") for the Hummer Nose Design Trademark as well as the overall trade dress for the Hummer vehicle.

There is no genuine dispute that the '544 registration is valid.  The nose design of the '544 registration, by its existence, establishes that the Hummer nose design has acquired secondary meaning and is non-functional.

Likewise, there is no genuine dispute that the Hummer vehicle design is protectable trade dress under the Lanham Act.  There can be no genuine dispute that the Hummer vehicle trade dress has acquired secondary meaning.  Indeed, an independent survey demonstrated that: "[t]he Hummer trade dress has very strong secondary meaning, among the highest [ever] seen."  Nor can there be a genuine dispute that the Hummer vehicle trade dress is non-functional.

There is also no genuine dispute that the nose design of the '544 registration and the Hummer vehicle trade dress are infringed.  Lanard admits that it intentionally copied GM's Hummer vehicle design into its toy products.  This intentional copying is likely to confuse customers into believing that the toys are being put out by GM or



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-1-

authorized, sponsored or approved by GM.  The law  presumes that Lanard got what it intended by its acts of copying – consumer confusion.   Further, a survey conclusively demonstrated that Lanard in fact created customer confusion.

Lanard's blatant infringement of the Hummer vehicle design is a direct violation of the Lanham Act.  GM asks this Court to grant GM's motion for summary judgment that each of the accused toys infringes the Hummer vehicle nose design of the '544 registration and the Hummer vehicle trade dress.

BK

LAW OFFICES

**BROOKS & KUSHMAN P.C.**

1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## II.  UNDISPUTED FACTS

### 1.    The Hummer Vehicle Design



(See Exhibit 31, Photo Illustrating the Hummer Vehicle Design.)

#### a.    AM General

AM General originated the Hummer vehicle design.  The history of the products sold and marketed by AM General was set forth in a published opinion from the Seventh Circuit.  *AM General Corp. and General Motors Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 808-809 (7th Cir. 2002)(Exhibit 1)[1].

> C. HISTORY OF THE HUMVEE AND THE HUMMER
> As already noted, AM General won the contract to produce the Humvee for the military during the rebuilding of the United States armed forces in the 1980s.  In February 1981, the U.S. Government invited proposals for a new High Mobility Multipurpose Wheeled Vehicle, and AM General was one of five companies that submitted proposals.  AM General's Technical Proposal included drawings depicting the

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

---

[1] All exhibits referenced herein are attached to the declaration of Marc Lorelli filed herewith.

design of AM General's proposed Humvee vehicle, including a grille design with nine vertical pill-capsule-shaped slots that were slightly taller than the round headlights that "bookended" the slots.

AM General was among three companies awarded "Phase I" contracts in July 1981; those contracts provided funding for production of prototype HMMWV vehicles for the U.S. military to test. In July 1982, AM General applied to the U.S. Patent and Trademark Office ("the PTO"), for a design patent on the Humvee, including the vertically-slotted grille design. That design patent was never issued. In March 1983, the government selected AM General to manufacture the HMMWV.

During the government's testing of the Humvee prototypes, AM General engineers made various design modifications based on performance issues raised by the government; in one of those changes, the engineers moved the headlamps inboard and eliminated the two outer slots of the nine-slotted grille. The Humvee's seven-slotted grille first appeared in a blueprint completed in November 1982. Since the government's 1983 acceptance of the final production versionof the Humvee, every Humvee (apart from some 3,000 upper-armored vehicles) has employed the AM General engineer's front grille design consisting of seven vertical slots. AM General sent production versions of the Humvee to the military in 1984 for more testing, but didn't begin shipping Humvees to the military until March 1985.

American Motors sold its AM General stock and assets to LTV Corporation on July 24, 1983.

The Humvee was featured quite favorably in 1990 news coverage of Operation Desert Shield during the months in which forces gathered in the Persion Gulf for what became Operation Desert Storm. Building on that renown as a Desert Storm "hero," AM General launched a commcercial vehicle then called the "Hummer" (now called the "H1") in 1992. The H1 was (and continues to be) equipped with literally the same hood as the Humvee, with the same vertically-slotted grille design.



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-4-

AMGeneral adopted its "Hummer icon" — a silhouette of an approaching H1 — in 1992. The logo displays in black the veritcal, bisected windshield, the side mirrors, the tires and undercarriage/suspension, while highlighting the headlights, the frong grille's seven vertical openings, the upper (hood) grille, and a series of three circles below the bumper that were not identified at the hearing. The icon appeared on promotional items accompanying the national launch of the H1 in 1992, and has appeared since on all subsequent Hummer dealer signs, company stationery, and business cards. AM General adopted the icon as its official company logo in 1993. Since 1994, several items of Hummer merchandise included in a catalog ("Hummer Stuff") features the icon on such items as mugs, golf balls, key chains, posters, T-shirts, caps, toys, sew-on patches, and a tie tack/lapel pin that shows only the H1 front end, including the grille.

In 1993, AM General applied for a U.S. trademark registration for the appearance of the front end of the Humvee, which includes the headlight sockets, running light openings, grille, and bumper. The application sought registration for trucks, and not just military trucks or high-end sports utility vehicles. The examiner denied the application on three grounds: it was not inherently distinctive (was not a source identifier for consumers); it was merely ornamental rather than a source identifier; and it was likely to be confused with another registration — the first of the three registrations for the Jeep Wrangler grille/headlight configuration. AM General twice sought reconsideration, with the second effort producing approval and publication.

On March 5, 1996, the Hummer Nose Design Trademark was issued as U.S.

Registration No. 1,959,544 ("the '544 registration"). (Exhibit 2.)





LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

The Hummer Nose Design Trademark as well as the Hummer vehicle trade dress have been used extensively by AM General as a trademark.

> Every AM General sales brochure for the H1 featured the Hummer grille; some included the language: "Hummer, Humvee and the Hummer vehicles' grille designs are registered trademarks of AM General Corporation.
>
> ***
>
> Many photographs that have appeared in the print media over the last ten years have viewed the Humvee or H1 from the front, which draws attention to the grille. AM General paid for some of those promotions, but most appeared without expense to AM General. Some of those photos of approaching Humvees and/or H1s are found in ads by other firms, such as Panasonic and Mastercard that obtained AM General's permission to use the vehicles in attempts to associate their products and services with the Hummer brand. These advertisements and photographs have appeared in national publications such as the *Wall Street Journal* and *USA Today*. AM General also licensed companies to use images of the Humvee (in which the grille is featured prominently) to sell their own merchandise. DaimlerChrysler never challenged AM General's use of the grille design on the Humvee, and until this litigation, DaimlerChrysler had never objected to or challenged AM General's grille design on the H1.

*AM General*, 311 F.3d at 809.

b.   <u>General Motors</u>

While the H1 was gaining recognizability (though not sales — at more than $100,000.00, AM General never sold more than 900 H1s in a year), General Motors was exploring the possibility of developing a very rugged four-wheel drive SUV — code-named "The Chunk" — under an existing General Motors brand. Market research was promising, but faced with the need to spend hundreds of millions of dollars to



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

launch such a new vehicle, General Motors decided to look into the Hummer, which (according to General Motors's research) had a highly favorable image and was well-known to the potential purchasers for such an SUV — qualities that would be difficult to build from scratch for an entirely new model. Negotiations ensued, and in June 1999, AM General and General Motors announced their intentions to enter into a contract that would transfer the Hummer brand to General Motors and pursue new product opportunities for the Hummer brand. Within days after that press release, DaimlerChrysler was consulting its lawyers concerning "legal issues in Hummer dispute" and "Hummer litigation." Despite those discussions, DaimlerChrysler said nothing to General Motors.

On December 21, 1999, General Motors and AM General entered into a series of agreements to transfer to General Motors the Hummer brand and all intellectual property rights embodied in the Hummer vehicle. General Motors granted AM General exclusive production rights for the first new model of Hummer vehicle; AM General agreed to construct a brand new facility for that purpose; General Motors gave AM General the continued right to use the Hummer grille design on the Humvee.

*AM General*, 311 F.3d at 809-810.

In deciding whether to purchase the Hummer brand including the associated vehicle design, General Motors commissioned BDSC, a leading market survey company, to evaluate the strength of the Hummer brand. (Exhibit 3, GMH 2531-2545.) BDSC concluded that Hummer vehicle had the strongest brand association in the sport-utility market which was "derived visually from Brand ques including a rugged, military, tank-like look; front grille design; vehicle size and width; tire size; and overall box exterior shape." (*Id*. at GMH 2533.)

The December 1999 General Motors-AM General agreements contemplated a joint effort to manufacture, market, and distribute the Hummer and new Hummer models, the first



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-7-

of which was the H2. The H2 was to be about the same size as the very large original H1 (a bit taller, a bit narrower), but would include luxury features not available on the H1. The H2 was to retain the H1's visual brand identity and character, in the hopes of endowing it with the broad recognition and favorable identity General Motors's consumer research found in the H1. That research found the H1's front end, including the grille, to be one of several visual cues important to consumers; accordingly, the grille General Motors intends to use on the H2 is a narrower version of the grille used on the H1 and the Humvee before it, with the configuration of vertical slots that appear in the Hummer front end registration.

*AM General*, 311 F.3d at 810.

## 2. AM General And General Motors' Use Of The Hummer Vehicle Design For Toys

The popularity of the Hummer brand and the Hummer vehicle design is unmatched. This popularity has led to many requests by toy manufacturers to license this valuable intellectual property.

Prior to General Motors acquisition of the intellectual property rights in the Hummer, AM General licensed numerous toy manufacturers to make toys that resemble the Humvee and Hummer. (Exhibit 4, Summary of select AM General License Agreements, GMH 594-596.) After the acquisition, General Motors has continued to license its intellectual property rights in the Hummer and Humvee, including of course, the distinguishing Hummer Nose Design Trademark and the Hummer vehicle trade dress. (Exhibit 5, Summary of General Motors License Agreements, Attachment 200 - Chase Expert Report.)



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-8-

3.   **Lanard's Use Of General Motors' Hummer
     Vehicle Design In Its Toys**

In an attempt to trade off of the popular Hummer vehicle design, Lanard produces toys that are a knock-off of the famous Hummer vehicles. **Lanard admitted that it copied the famous Hummer and Humvee vehicles in creating its toys.** (Exhibit 6, Tebbe Dep., p. 16:22 - 17:12; 19:20 - 20:4; Exhibit 7, Dep. Exh. 85.) Lanard's designer, Mark Tebbe, testified that he used reference photos of the Hummer vehicle to design Lanard's toys. (Exhibit 6, Tebbe Dep., p. 16:22 - 17:12; 19:20 - 20:4; Exhbit 7, Dep. Exh. 85 .) Indeed, Mr. Tebbe testified that he tried to make the toy "an accurate reproduction of the Humvee." (Exhibit 6, Tebbe Dep., p. 17:8-12.) Lanard even internally called the Corps. ATK vehicle (an accused toy) the "Corps. Hummer." (Exhibit 6, Tebbe Dep., p. 29:21 - 30:17; Exhibit 8, Dep. Exh. 88; Exhibit 9, Dep. Exh. 90; ) And as expected, Lanard customers also refer to these toys as either a Humvee or Hummer toy. (Exhibit 10, GMH 2359 referring to Lanard's "Corps Humvee Set.") Indeed, Lanard's customers market these toys as a Hummer or Humveee toy. (Exhibit 11, Dep. Exh. 79.)

Lanard sells five toys that are copies of General Motors' Hummer vehicle design.



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-9-

### a.    The CORPS! ATK Vehicle

The CORPS! ATK Vehicle was first sold in the United States on August 3, 1997.   (Exhibit 27.)



The nose design of this toy is shown below without the brush guard.



(Exhibit 12, Photos of the CORPS!  ATK Vehicle.)

### b.    Mean Machine Vehicle

The Mean Machine Vehicle was first sold in the United States on March 20, 1999.  (Exhibit 27.)





LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

The nose design of this toy is shown below without the brush guard.



(Exhibit 13, Photos of the Mean Machine Vehicle.)

### c. Super Shots Pull String Vehicle

The Super Shots Pull String Vehicle was first sold in the United States on May 2, 2000. (Exhibit 27.)



The nose design of this toy is shown below both without the brush guard.



(Exhibit 14, Photos of the Super Shots Pull String Vehicle.)



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-11-

d.    **Ultra CORPS! ATK Vehicle**

The Ultra CORPS! ATK Vehicle was first sold in the United States on July 12, 2000.  (Exhibit 27.)



The nose design of this toy is shown below without the brush guard.



(Exhibit 15, Photos of the Ultra CORPS!  ATK Vehicle.)

e.    **Infrared Vehicle**

The Infrared Vehicle was first sold in the United States on August 5, 2000.  (Exhibit 27.)



**BK**

LAW OFFICES

**BROOKS & KUSHMAN P.C.**

1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

The nose design of this toy is shown below without the brush guard.



(Exhibit 16, Photos of the Infrared Vehicle.)



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## III. ARGUMENT

### A.     Applicable Law

#### 1.     The Law Of Summary Judgment

Summary judgment must be granted when the moving party demonstrates that there is no genuine dispute as to any material fact, and that the undisputed facts of record require that judgment enter, as a matter of law, for the movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute about a material fact is 'genuine' only if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 893 (6th Cir. 1991) (quoting *Anderson,* 477 U.S. at 248.)

To survive a motion for summary judgment, the non-movant must come forward with evidence that creates some dispute of fact as to "an element essential to that party's case, and on which that party will bear the burden of proof at trial. . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). "If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250. In making such a determination, the Court examines evidence in a light most favorable to the non-moving party. *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991).



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-14-

### 2. Federal Trademark Infringement

Under Federal law:

(1) Any person who shall, without the consent of the registrant–

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. .

.

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1), § 32 of the Lanham Act.

Thus, to prevail in an action for trademark infringement under the Lanham Act, a plaintiff must prove that a likelihood of confusion exists between defendant's product and the registered trademark. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir. 1983). This is the same standard used for Michigan trademark infringement. M.C.L.A. § 429.42(a).

### 3. The Law Of Trade Dress Infringement

The Lanham Act's protection also extends to unregistered trade dress. *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 F.3d 929, 936 (6th Cir. 1999) *overruled in part on other grounds*, 532 U.S. 23 (2001). Trade dress refers to the image and overall appearance of a product and embodies that arrangement of identifying characteristics connected with a product, intended to make the source of the product



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-15-

distinguishable from another and to promote its sale. *Ferrari S.P.A. Esercizio Fabriche Automobili e Corse v. Roberts,* 944 F.2d 1235, 1239 (6th Cir. 1991).

The standard for proving trade dress infringement under the Lanham Act is as follows:

> (1) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
>
>         * * *
>
> (3) ...for trade dress not registered on the principle register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

15 U.S.C. § 1125(a); § 43(a) of the Lanham Act.

Thus, to prevail in an action for trade dress infringement under the Lanham Act, a plaintiff must prove: (1) that the trade dress is protectable because it has acquired distinctiveness through secondary meaning and the appropriated features of the trade dress are primarily non-functional; and (2) that a likelihood of confusion exists between defendant's product and the asserted trade dress. *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002). This is the same standard used for Michigan trade dress infringement. MCLA § 429.42(a).



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

**B.    The Hummer Vehicle Design Is Protectable Trade Dress**

There is no genuine issue of fact as to whether GM's Hummer vehicle trade dress is protectable. The public strongly associates the Hummer vehicle trade dress with a single source. Thus, the trade dress has acquired secondary meaning. The Hummer vehicle trade dress is also non-functional because it is not essential to the use or purpose of the Hummer vehicle and GM's exclusive use would not put others at a competitive disadvantage. Indeed, many courts, including this Court, have found protectable trade dress in vehicle designs.[2] Moreover, the United States Patent and Trademark Office has routinely granted trade dress protection to many other vehicle designs, finding that the designs had acquired secondary meaning and were not functional. (Exhibit 17, Selected Trademark Registration for Vehicle Designs.)

**1.    GM's Hummer Vehicle Trade Dress Has Acquired Secondary Meaning**

Trade dress of a product configuration such as GM's Hummer vehicle trade dress is protectable if it is found to have secondary meaning. *Ferrari,* 944 F.2d at 1239. Trade dress acquires a "secondary meaning" when it is so recognizable to the general public that it prompts the perspective customer to affirm, "that is the article that I want because I know its source." *Id.* Secondary meaning can be presumed when it is apparent that the defendant intentionally copied the plaintiff's trade dress. *Id.; See also DAP Products v.*

---

[2] In *Esercizio,* 944 F.2d at 1239, the Sixth Circuit determined that the Ferrari automobile design was non-functional and had acquired secondary meaning, thus qualifying for protection. In *Chrysler Corp. v. Newfield,* 880 F. Supp. 504 (E.D. Mich 1995), this Court determined the many automobiles designs including the Dodge Viper, Plymouth Slingshot and Jeep Sahara were protectable trade dress.

BK

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

*Color Tile Manufacturing*, 821 F.Supp. 488, 492 (S.D. Ohio 1993)(Secondary meaning can be presumed where a court can infer that the defendant intentionally copied plaintiff's color scheme.)

In this case, secondary meaning can be presumed from Lanard's admissions that it copied GM's Hummer vehicle design. (Exhibit 6, Tebbe Dep., p. 16:22 - 17:12; 19:20 - 20:4; Exhibit 7, Dep. Exh. 85.) Lanard's designer, Mark Tebbe, testified that he used reference photos of the Hummer vehicle to design Lanard's toys. (Exhibit 6, Tebbe Dep., p. 16:22 - 17:12; 19:20 - 20:4; Exhibit 7, Dep. Exh. 85: .) Indeed, Mr. Tebbe testified that he tried to make the toy "an accurate reproduction of the Humvee." (Exhibit 6, Tebbe Dep., p. 17:8-12.) This intentional copying is strong evidence of secondary meaning because "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Ferrari*, 944 F.2d at 1239 (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

Notwithstanding this presumption, there is no genuine issue of fact that the Hummer vehicle design has acquired secondary meaning. GM retained Howard Marylander, a survey and marketing expert, to design and conduct a survey on the secondary meaning issue. The survey determined that 67% of the respondents associate the appearance of the vehicle with Hummer, Humvee or General Motors." (Exhibit 18, Marylander Declaration regarding Secondary Meaning.) Based on the survey, Mr. Marylander concludes that: "[t]he Hummer trade dress has very strong secondary

**BK**

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-18-

meaning, among the highest I have seen." (*Id.* at 7.) Lanard has not produced any evidence to the contrary.

### 2. GM's Hummer Vehicle Trade Dress Is Non-Functional

A product feature is deemed functional if it is essential to the use or purpose of the device or when it affects the cost or quality of the device. In addition, a feature is functional if it would put competitors at a significant non-reputational disadvantage. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995).

None of the design features that GM claims as its trade dress is essential to the use or purpose of the toys in question. Nor are the design features in question any more costly than other possible vehicle designs.

In addition, trade dress protection of GM's vehicle designs would not prevent others from designing toys or automobiles. There are virtually hundreds, if not thousands, of automobile and toy designs existing in the marketplace.

Finally, the USPTO and many courts, including this Court, have determined that many vehicle designs — like the one at issue here — are non-functional and entitled to trade dress protection. *See, e.g., Ferrari*, 944 F.2d at 1239; *Chrysler Corp.*, 88 F.Supp. at 504. Indeed, the United States Patent and Trademark Office has granted trade dress rights in a number of vehicles designs. (Exhibit 17, Selected Trademark Registrations for Vehicle Designs.)

**BK**

LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-19-

C.   **Lanard's Copying The Hummer Vehicle Design Creates
A Presumption Of Likelihood Of Confusion For Both The
Hummer Vehicle Trade Dress And The Hummer Nose Design Trademark**

Under Sixth Circuit law, copying a vehicle design creates a presumption of likelihood of confusion. *Ferrari S.P.A. Esercizio Fabriche Automobili e Corse v. Roberts*, 944 F.2d 1235, 1242-43 (6th Cir. 1991); *see also, Frisch's Restaurants v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)("since the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] *that fact alone may be sufficient to justify the inference that there is confusing similarity.*")(emphasis in original).

In *Ferrari*, like the present case,[3] the defendant intentionally designed a product to look as much as possible like vehicle of the plaintiff which created a "presumption of likelihood of confusion." *Ferrari*, 944 F.2d 1243; Exhibits 6 and 7.  It is presumed that Lanard got what it intended: consumer confusion.  Lanard has not and cannot present any evidence to overcome this presumption.

D.   **GM's Survey Evidence Establishes That The Public
Is Being Confused As To Whether The Accused
Toys Are Sponsored Or Approved By GM**

To establish that the public is being confused as to the source, authorization/approval, or business connection/affiliation of Lanard's toys, GM retained Howard Marylander to also design and conduct survey to this issue.  (Exhibit 19, Declaration regarding Source Confusion.)   In Marylander's opinion, the results of the

**BK**
LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

---

[3] *See supra*, pp. 8-9.

conducted survey demonstrate that "there is substantial confusion as to the source for the Lanard Mission Vehicle [CORPS! ATK]." (*Id.* at p. 7.)

Some courts have found surveys to be the most accurate evidence of actual confusion. *Stewart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 790-91 (8th Cir. 1995); *Wood Smith Pub Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1999). Courts have usually found that survey evidence indicating ten to twelve percent confusion is sufficient to demonstrate actual confusion. *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983).

Marylander "designed and executed a study to determine whether there was a likelihood of source confusion between Lanard's Mission Vehicle toy and the Hummer vehicle." (Exhibit 19 at p. 3.) Two hundred interviews were conducted in which respondents were shown two Lanard toys, one in the box and one out of the package. (*Id.* at p. 5.) These respondents were males and females, having boys between 5 and 11 years of age and purchased toys cars or trucks for their sons in the past 12 months or considered it likely that they would do so in the next 12 months. (*Id.* at p.5.)

The results of this survey demonstrate that approximately thirty-nine percent (39%) of the relevant universe of potential customers expressed the belief that the defendant's toy product was authorized, sponsored, or approved by the makers of the Hummer vehicle — about 4 times the level sufficient for a determination of likelihood of confusion. (*Id.* at p. 10.) As such, a finding of likelihood of confusion is warranted.

**BK**

LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-21-

**E.    A Finding Of Likelihood Of Confusion Is Also
Required When Considering All Relevant Factors
Under The Federal Lanham Act And Michigan Law**

All of the relevant factors considered by federal courts in conducting a "likelihood of confusion" analysis under the federal Lanham Act (15 U.S.C. § 1501 *et seq.*) also point toward a likelihood of confusion here.  *See Frisch's Restaurants v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982).  These relevant factors — the *"Frisch's"* factors — include:

1. strength of plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Id.* at 648.[4]

The Sixth Circuit has advised that when applying these factors a court must recognize that "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1107 (6th Cir. 1991) (footnote omitted).  Thus, "[a] party claiming infringement need not show all, or even most, of these factors in order to prevail." *Ferrari*, 944 F.2d 1235, 1242 (6th Cir. 1991).  In this

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

---

[4] These same factors should be used in the legal analysis under Michigan common law. *See Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991) ( finding that the Michigan Supreme Court would evaluate a common law claim for unfair competition using the same factors as applied in federal claims involving unfair competition).

In this case, reviewed against all of the relevant *Frisch's* factors, defendant's use of Hummer vehicle trade dress and the Hummer Nose Design Trademark suggests or implies to the relevant market that the defendant and GM are affiliated or that defendant's goods are sponsored by GM.

### 1.    Strength of the Mark

The Hummer vehicle design is extremely strong.  The strength of the mark was discussed in *AM General Corp. and General Motors Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 808 (7th Cir. 2002).



AMGeneral adopted its "Hummer icon" — a silhouette of an approaching H1 — in 1992. . . . The icon appeared on promotional items accompanying the national launch of the H1 in 1992, and has appeared since on all subsequent Hummer dealer signs, company stationery, and business cards. AM General adopted the icon as its official company logo in 1993.

(Exhibit 20, GMH 31.)

Since 1994, several items of Hummer merchandise included in a catalog ("Hummer Stuff") features the icon on such items as mugs, golf balls, key chains, posters, T-shirts, caps, toys, sew-on patches, and a tie tack/lapel pin that shows only the H1 front end, including the grille.

*AM General*, 311 F.3d at 809.

(Exhibit 21, GMH 2496-2504.)



BK

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-23-



Every AM General sales brochure for the H1 featured the Hummer grille; some included the language: "Hummer, Humvee and the Hummer vehicles' grille designs are registered trademarks of AM General Corporation.

*Id.*

(Exhibit 22, GMH 2462-2472; 2477.)

Many photographs that have appeared in the print media over the last ten years have viewed the Humvee or H1 from the front, which draws attention to the grille. AM General paid for some of those promotions, but most appeared without expense to AM General.

*Id.*

(Exhibit 23, GMH 2473-2474.)





Some of those photos of approaching Humvees and/or H1s are found in ads by other firms, such as Panasonic and Mastercard that obtained AM General's permission to use the vehicles in attempts to associate their products and services with the Hummer brand. These advertisements and photographs have appeared in national publications such as the *Wall Street Journal* and *USA Today*. AM General also licensed companies to use images of the Humvee (in which the grille is featured prominently) to sell their own merchandise.

*Id.*

(Exhibit 24, GMH 2485-2495.)

The strength of the Hummer Vehicle Design is further evidenced by a survey conducted by Mr. Howard Marylander. (Exhibit 18, Marylander Declaration regarding

BK

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

Secondary Meaning.) Mr. Marylander concluded that the Hummer vehicle trade dress has "very strong secondary meaning, among the highest I have seen." (*Id.* at p. 7.)[5] Further, General Motors commissioned BDSC, a leading market survey company, to evaluate the strength of the Hummer brand prior to its agreement with AM General. (Exhibit 3, GMH 2531-2545.) BDSC concluded that Hummer vehicle had the strongest brand association in the sport-utility market which was "derived visually from Brand ques including a rugged, military, tank-like look; front grille design; vehicle size and width; tire size; and overall box exterior shape." (*Id.* at GMH 2533.) There can be no dispute that the Hummer vehicle design is an extremely strong mark.[6]

2.     Relatedness of the Goods

GM licenses toy manufacturers to make products that bear its trademarks, including the Hummer vehicle trade dress and the Hummer Nose Design Trademark. (Exhibits 4-5.) Thus, there is direct competition in the toy business.

---

[5] The survey determined that 67% of the respondents associate the appearance of the vehicle with Hummer, Humvee or General Motors." (Exhibit 18, Marylander Declaration regarding Secondary Meaning.)

[6] Moreover, the Hummer Nose Design Trademark is incontestable. Therefore, it "must be considered strong and worthy of full protection." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988). Indeed, the very fact that defendant chose to incorporate the Hummer Nose Design Trademark into its toys so as to ensure consumer acceptance evidences the fact that the trademark is are strong and well-known. The strength of these marks, when misappropriated by the defendant, increases the likelihood of confusion by both purchasers and the public.



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-25-

3.   **Similarity Of Marks**

The defendant's toys are essentially identical as to the Hummer vehicle trade dress and the Hummer Nose Design Trademark.

a.   **Hummer Nose Design Trademark**

Hummer Nose Design Trademark
Registration No. 1,959,544



The CORPS! ATK Vehicle



Mean Machine Vehicle



Super Shots Pull String Vehicle



Ultra CORPS! ATK Vehicle



Infrared Vehicle



**BK**

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-26-

b.    **Hummer Vehicle Trade Dress**

| Hummer Vehicles | Lanard's Hummer Toys |
|---|---|
|  |  |
|  |  |
|  |  |



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400






Even if there are trivial distinctions, they are immaterial. The Supreme Court has long held that "exact similitude is not required." *McLean v. Fleming*, 96 U.S. 245 (1878) (cited in 3 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:20, at 23-62.3 (2001)). In fact, "[w]here the goods and services are directly competitive, the degree of similarity to prove a likelihood of confusion is less than in the case of dissimilar products. *Id.*, § 23:20.1, at 23-62.5.

In evaluating the similarity of the designs, "a court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Wynn Oil Co. v. American Way Service Corporation*, 943 F.2d 595, 601 (6th Cir. 1991). Defendant has incorporated the exact shapes of the Hummer



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-28-

Nose Design Trademark marks into its toys.   To customers for such toys, there is confusion.  (Exhibit 19.)

4.     Evidence Of Actual Confusion

Actual confusion can be shown by either direct evidence or by survey evidence.  *Brust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997).   As discussed supra, GM's expert, Mr. Howard Marylander, conducted a survey which clearly demonstrates that the relevant public is likely to be confused or deceived by the belief that Lanard's toys are being put out by or sponsored, authorized, or approved by the makers of the full-sized Hummer vehicle.  (Exhibit 19.)  Thus, this factor strongly favors GM.

The results of this survey demonstrate that approximately thirty-nine percent (39%) of the relevant universe of potential customers expressed the belief that the drawing or picture on defendant's toy product was authorized, sponsored, or approved by the makers of the Hummer vehicle.  (*Id.* at p. 10.)  39% is about 4 times higher the level sufficient for a determination of likelihood of confusion.  *Henri's Food Products*, 717 F.2d at 358.  As such, a finding of likelihood of confusion is warranted.

5.     Marketing Channels Used

General Motors' licensees and Lanard have the same customer base — retail stores.  The parties are direct competitors.  The marketing channels for toys are the same.

**BK**

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-29-

Because the parties are direct competitors using the same marketing channels, "confusion is likely if the marks are sufficiently similar." *Pita Delight v. Salami*, 24 F. Supp. 795, 801 (E.D. Mich. 1998). Given the virtual identity of the marks, the conclusion that confusion is likely is incontrovertible.

### 6. Likely Degree Of Purchaser Care

"In general, the less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion." *Wynn Oil Co.*, 943 F.2d at 602. A higher likelihood of care is expected when prospective purchasers have relevant expertise or sophistication, or when the goods are expensive or unusual. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 285 (6th Cir. 1997). Courts have adopted the general proposition that the average customer is not likely to exercise a high degree of care in purchasing relatively inexpensive products. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 672 (Fed. Cir. 1984).

Defendant's toys are inexpensive — typically selling for about five dollars ($5). Thus, due to the inexpensive nature of the product, customers would not likely exercise a great deal of care when purchasing these toys. This factor heavily favors GM.

### 7. Intent in Incorporating the Hummer Nose Design Trademark

As discussed *supra*, it is indisputable that Lanard intended to incorporate the Hummer vehicle trade dress into its toy products. "Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-30-

likelihood of confusion." *Wynn*, 943 F.2d at 602. Indeed, "[a] party's intent in using another party's mark 'is a critical factor, since of the mark was adopted with the intent of deriving benefit from the reputation of the plaintiff, *that fact alone may be sufficient to justify the inference that there is confusing similarity*.' *Frisch's Restaurants*, 670 F.2d at 648 (emphasis in original). . . ." *Chrysler Corp.*, 880 F. Supp. at 511; see also *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997) ("[P]urposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact, believes that his copying may divert some business from the senior user."); *Wynn*, 943 F.2d at 603.

8. <u>Likelihood Of Expansion Of The Product Line</u>

The product lines are already the same. Since the parties both make and sell toys as direct competitors, expansion is not relevant to this case.

BK

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-31-

## IV. CONCLUSION

It is evident that <u>all</u> of the relevant *Frisch's* factors favor a finding of likelihood of confusion, and, perforce, of infringement by Lanard fo both the Hummer Vehicle Trade Dress and Hummer Nose Design Trademark. GM according requests that this Court enter a summary judgment of infringement against Lanard.

Respectfully submitted,

**BROOKS & KUSHMAN P.C.**

By: _____

MARK A. CANTOR   (P32661)
MARC LORELLI      (P63156)
1000 Town Center
Twenty-Second Floor
Southfield, Michigan  48075
Tel:      (248) 358-4400
Fax:      (248) 358-3351

*Attorneys for Plaintiff*

Dated: _5/12/03_____

<u>OF COUNSEL</u>:

Charles H. Ellerbrock (P43795)
General Motors Corporation Legal Staff
300 Renaissance Center
P.O. Box 300
Detroit, MI  48265-3000



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400